In re William J. McLAREN, Debtor.

William LONGO, Sr., Plaintiff,

v.

William J. McLAREN, Defendant.

Bankruptcy No. 88–04828.
Adv. No. 90–0230.

United States Bankruptcy Court,
N.D. Ohio.

Jan. 24, 1992.

Robert M. McIntyre, McIntyre, Kahn & Kruse Co., L.P.A., Thomas C. Pavlik, Sindell, Rubenstein, Einbund, Pavlik, Novak & Celebrezze, Cleveland, Ohio, for debtor-defendant.

Jack M. Schulman, Schulman & Schulman, Sheldon Stein, Cleveland, Ohio, for plaintiff.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

The plaintiff brought this adversary proceeding to establish that several payments made by him to the Debtor, or to entities controlled by the Debtor, were nondischargeable under subsections 523(a)(2), (4) or (6) of the Bankruptcy Code and to revoke the Debtor's discharge under section 727(d)(3) of the Code because of the Debtor's alleged failure to obey an order of the Court. The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b) and General Order No. 84 entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

This proceeding was tried before the Court on September 4 and 5, 1991. Plaintiff testified on his own behalf and called an accountant with the firm of accountants which had done work for the Debtor and entities controlled by him. He also called the Debtor as a witness; however the Debtor invoked his Fifth Amendment privilege against self-incrimination and refused to testify. The Court sustained the Debt-

or's Fifth Amendment claim of privilege but permitted plaintiff's counsel to read into the record portions of the transcript of the Debtor's 2004 examination. At Debtor's request the Court admitted the transcript of the balance of the 2004 examination. The Debtor's case was limited to recalling the plaintiff for examination.

## BACKGROUND

The Debtor has been a stockbroker since the late 1950's. He worked for a number of brokerage firms including McDonald & Company, where his father was for a time the managing partner. In the 1980's he also was active in the promotion and syndication of limited partnerships. By the late 1980's he had become hopelessly in debt; on December 22, 1988 he filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code. According to the Debtor's schedules, he owed more than $10 million to various creditors including approximately $868,000 to the plaintiff. His schedules showed only $78,150 in assets. The Debtor's effort to reorganize was not successful and on January 22, 1990 the Court converted his case to chapter 7 for liquidation. The Court granted the Debtor his discharge on August 27, 1990.

Plaintiff is a high school graduate, he testified that he had taken several college business courses, but he was obviously not a knowledgeable or sophisticated investor. He was vice-president of a family business which manufactured high performance sealants and caulks until the sale of the business in 1984. The plaintiff realized several million dollars on the sale. Soon after he came into his share of the proceeds of the business he sought out the Debtor for investment advice. They were members of the same country club and were, apparently, casual acquaintances.

Plaintiff approached the Debtor in early 1985 with a view towards investing in municipal bonds and apparently made a number of such investments. But over the ensuing months the Debtor persuaded him to invest heavily in other endeavors in which the Debtor had a predominant personal interest. Each of these investments

proved a disaster and plaintiff lost virtually all of the money he invested. He filed this adversary proceeding on the theory that each of these investments had been induced by the Debtor's fraud.

These investments each involved partnerships in which the Debtor was a general partner. In the first the plaintiff purchased a $300,000 interest in Peroil 1985–1, Ltd., an Ohio limited partnership syndicated by the Debtor to engage in oil and gas exploration and development. In the next, the plaintiff paid the Debtor $400,000 in connection with the proposed acquisition and syndication of a strip shopping center near Cleveland known as Northfield Plaza. The third was a $350,000 loan by the plaintiff to Westland Plaza Limited, an Ohio limited partnership which owned a strip shopping center in Columbus, Ohio. Plaintiff asserts that his $300,000 investment in Peroil 1985, $200,000 of his $400,000 payment to the Debtor in connection with Northfield Plaza and his $350,000 loan to Westland Plaza are obligations of the Debtor to him which are nondischargeable under section 523(a)(2), (a)(4) and/or (a)(6) of the Bankruptcy Code. In relevant part section 523(a) provides as follows:

§ 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

Although subsections 523(a)(4) and (6) are, as noted, subsequently implicated in this

proceeding to a limited extent, Debtor bases his case on the "false representations" and "fraud," specified in subsections 523(a)(2)(A) of the Bankruptcy Code.

■ The facts required to prove nondischargeability under section 523(a)(2)(A) of the Bankruptcy Code are substantially the same as those required to prove fraud under Ohio law. *Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986); *Burr v. Stark County Board of Commissioners*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986). The burden of proof under both federal and Ohio law is a preponderance of the evidence. *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *see* 51 O.Jur.3d *Fraud and Deceit* § 255 (1984) and cases cited therein.

■ According to the Ohio Supreme Court, the elements of fraud (including false pretenses and misrepresentation) are:

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the representation or concealment, and

(f) a resulting injury proximately caused by the reliance.

*Burr v. Stark County Board of Commissioners*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) (paragraph two of the syllabus); *see also Shover v. Cordis Corp.*, 61 Ohio St.3d 213, 574 N.E.2d 457 (1991); *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 462 N.E.2d 407 (1984).

### PEROIL 1985

■ As its name suggests, Peroil 1985 was one of a series of oil and/or gas ventures promoted by the Debtor, all but one of which was also designated by the year of its syndication: Warrant 1492, Peroil 1982, Peroil 1983 and Peroil 1984. (A Peroil 1986 was also contemplated but never launched.) Each of these ventures was an Ohio limited partnership in which the Debtor was the general partner. None of these partnerships engaged directly in oil or gas exploration, development or production. Each channeled its operations through a turnkey drilling contract. Each entered into a drilling contract with 8916 Perkins Corp., an Ohio corporation wholly owned and controlled by the Debtor which derived its name from the Debtor's Mentor, Ohio, home address. However, Perkins did not engage in any drilling or oil and gas activities; it had no office and no employees other than the Debtor. Its role was limited to subcontracting the actual work, generally to an entity called British American Petroleum Company.

Although the Debtor's description of his oil and gas ventures at his 2004 examination was hazy and sometimes contradictory, it appears clear enough that the last two were total failures and the earlier ventures were at best marginal. The investors received little if any return from the proceeds of the ventures' wells. From the inception the Debtor had apparently covered some operating costs of the ventures and made distributions to partners from funds other than those generated by the ventures. Both the oil and gas markets had deteriorated; the Debtor moved the drilling site, first from Bradford to Oil City Pennsylvania, then to Kentucky. In Kentucky the Debtor switched his efforts from oil to gas. Debtor's syndication fortunes had also declined. Peroil 1984 raised only $235,000 although it had committed to a $1,170,000 drilling contract with Perkins. Peroil 1985 raised $715,000 of a planned $1.3 million, $300,000 from the plaintiff.

The Court finds that the Debtor sold the plaintiff a $300,000 limited partnership interest in Peroil 1985 with assurances that the Debtor's earlier ventures had been successful, that two of the plaintiff's and the Debtor's mutual acquaintances were receiving substantial payments from the earlier ventures and that the plaintiff would realize a monthly return of $14 to $20 thousand based upon a projected $350,000 investment.

These representations were made in the context of a relationship in which the plaintiff had sought out the Debtor for conservative investments. The plaintiff was put under pressure to commit by the Debtor's representation there was limited availability. The Debtor did not dispute this testimony but would deflect it by characterizing the projections as "puffing" and by denying plaintiff the right to rely upon the Debtor's other representations, primarily because the Peroil interest was sold pursuant to a prospectus which, according to the Debtor, superseded or qualified any such representations. In fact, it appears that the Debtor did not furnish plaintiff a copy of the prospectus until some time after plaintiff bought and paid for his partnership interest. The subsequent delivery of a prospectus could not legitimize prior misrepresentations or a completed fraud.

The Court finds that the Debtor's statement that his prior oil and/or gas ventures were successful was a material misrepresentation of the facts. It further finds that the representation that mutual acquaintances of the Debtor and plaintiff were receiving substantial payments from prior ventures was also materially false and misleading. Had the Debtor qualified this assurance with the admission that such payments had been made in whole or substantial part from his own funds, not from the ventures, it would have undercut his assurances that prior ventures were successful as well as his projections for the Debtor's investment in Peroil 1985.

The Debtor makes much of the fact that these projections were only predictions of future events, not misstatements of fact that can support a finding of fraud. But this conclusion ignores the fact that the Debtor's projections were intended to, and did, communicate the Debtor's apparent belief that the returns projected, ranging from 48 percent to 69 percent on an annual basis, were not only possible but were reasonably to be expected. Given the lack of success of his prior ventures, the Debtor could not realistically have expected returns in line with these projections. He may have hoped for such returns, but he could not have put them forward in good faith as his reasonable expectation. *See First Nat'l Bank v. F.C. Trebein Co.,* 59 Ohio St. 316, 52 N.E. 834 (1898); 50 O.Jur.3d *Fraud and Deceit* § 125 (1984).

The materiality of the Debtor's misrepresentations is obvious. It is difficult to imagine anything more material than assurance of an annual return of between 48 and 69 percent and that these projections were realistic in light of the success of the Debtor's earlier ventures. It is also clear that these representations were made to induce the plaintiff to rely on them and that they were made recklessly or with knowledge of their falsity. Certainly the Debtor knew that his representations as to the success of past ventures and of distributions to limited partners based on this success were false and that projections made in the context of these misrepresentations were bogus and misleading. Even if, despite the bleak history of his earlier ventures, he believed these projections for Peroil 1985, these projections were put forward with reckless disregard of facts known to the Debtor, not the plaintiff. *Isroff v. Westhall Co.,* No. 14184, 1990 WL 15192, 1990 Ohio App. LEXIS 589 (February 21, 1990); 50 O.Jur.3d *Fraud and Deceit* § 123 (1984).

The evidence is clear that the plaintiff relied on the Debtor's representations. The Debtor questions, however, whether this was the sort of reliance required for fraud under Ohio law or for nondischargeability under section 523(a)(2)(A) of the Bankruptcy Code. The Debtor points out that the plaintiff did not inquire of their mutual acquaintances of their experience with Debtor's earlier ventures. He did not read, at least in detail, the Peroil 1985 prospectus when delivered to him. He turned over $300,000 to the Debtor with little inquiry and in reliance on projected returns which, according to the Debtor, should have alerted him that he was investing in a highly speculative enterprise. But these facts show only the extent of the plaintiff's trust and confidence.

Plaintiff did business with the Debtor because of his reputation as a reputable

and sophisticated investment professional. Whatever the plaintiff's ability or skill in the family business he sold, he neither had, nor professed to have, any skill or sophistication in investing. It is hardly surprising that he proved susceptible to promises of huge returns from an adviser he believed reputable and sophisticated. The Debtor exploited plaintiff's trust and reliance. He cannot now avoid liability by characterizing it as unjustifiable or unreasonable. *Russ v. TRW Inc.*, 59 Ohio St.3d 42, 570 N.E.2d 1076 (1991), *reh'g denied*, 60 Ohio St.3d 720, 574 N.E.2d 1084 (1991). See *Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986) in which the court held that reliance without inquiry was reasonable where the parties were friends.

But had the plaintiff probed deeper, had he acquired and read the prospectus prior to the Peroil 1985 investment, he would not have penetrated to the heart of the fraud. He would have been put on notice that the Peroil 1984 was troubled, that the Debtor's experience in oil and gas was limited and that the Debtor benefited not only from the syndication and sale of partnership interests but from the ventures' drilling contracts. He would, however, not have learned that the Debtor was propping up the results of his prior ventures by paying bogus distributions.

8916 Perkins Corp. distributed $9,375.00 to the plaintiff on July 23, 1985 in respect of Peroil 1985 and Peroil 1985 distributed $27,980.10 to him on November 19, 1985. Peroil 1985 also issued checks to the plaintiff in the amount of $27,186.35 and $102,-618.38 in February and July 1986, both of which bounced. The Debtor characterized all of these payments (and attempted payments) as distributions from Peroil 1985. But Peroil 1985 never generated production income to fund distributions. According to his testimony the Debtor made similar payments in respect of prior ventures.

This behavior is hardly consistent with the Debtor's attempt to characterize Peroil 1985 as an ordinary, if highly speculative, oil and gas venture which the plaintiff embarked upon knowing (or charged with knowing) the risks. It is consistent only with a Ponzi-like scheme in which the Debtor attempted to disguise prior results in order to avoid the wrath of disappointed investors and to facilitate future syndications on a bogus record of good performance.

The record of Peroil 1985 was especially dismal. Although the Debtor raised a total of $715,000 in this syndication, Debtor testified at the 2004 exam that Peroil 1985 never drilled a single well. According to the Debtor, British American Petroleum, the subcontractor, drilled one well for Peroil 1984 and refused to proceed with the drilling because of an alleged breach of the subcontract. According to the Debtor, British American Petroleum never returned the balance of funds which had been paid to it by Perkins from the money raised in connection with Peroil 1985.

■ In summary, the Court finds that plaintiff's $300,000 investment in Peroil 1985 was induced by the Debtor's fraud and that Debtor is liable for the plaintiff's loss on that investment. The evidence shows that such loss is equal to the full amount of plaintiff's $300,000 investment less the $37,355.10 in aggregate distributions actually received by plaintiff in respect of that investment. Since it appears that these "distributions" were in fact transfers from the other funds controlled by the Debtor, not income generated by the investment, they should be deducted from plaintiff's damages. Plaintiff has not established that he is entitled to interest and his request for interest is denied. Plaintiff's request for punitive damages is discussed subsequently.

The Court further finds that Debtor's liability to plaintiff in the amount of $262,-644.90 for this fraud is not dischargeable under section 523(a)(2)(A) of the Bankruptcy Code. Plaintiff has not proved, however, that subsections (4) or (6) of section 523(a) are applicable to this liability.

### NORTHFIELD PLAZA

■ In contrast to the plaintiff's Peroil investment, Debtor does not dispute his liability for the full $400,000 received from Debtor in connection with Northfield Plaza.

Prior to trial, plaintiff withdrew his claim that $200,000 of the amount was nondischargeable under section 523. This amount was a loan by the plaintiff to the defendant. Dischargeability of the other $200,000 turns on whether it too was a loan, as the Debtor contends, or an investment earmarked for the Northfield Plaza project, as the plaintiff argues.

Here again the parties agree on certain key facts. In June 1985, several months after the plaintiff purchased his interest in Peroil 1985, Debtor offered plaintiff the opportunity to participate in the organization and syndication of a partnership which would acquire Northfield Plaza, a suburban Cleveland strip shopping center. The plaintiff and Debtor were to be partners of the general partnership that would manage the shopping center and the limited partnership syndicated to own it. Each would own 40 percent of the general partnership. The other 20 percent was to have been owned by a third individual who was also an acquaintance of the parties and an investor in Debtor's oil and gas partnerships. This proposed arrangement was spelled out in a letter in July 1985 from the Debtor to one of his attorneys. Despite his proposed role as a general partner, the plaintiff had no experience with managing commercial real estate. It appears obvious that he was offered this role to whet his appetite for the deal.

The Debtor took plaintiff to Northfield Plaza for an on-site inspection in June 1985. Shortly thereafter plaintiff paid $200,000 to 8916 Perkins Corp., the Debtor's wholly owned corporation, by a check which included on it the notation "Northfield." A few days later, plaintiff paid the Debtor the other $200,000 in return for a promissory note executed by 8916 Perkins Corp. and the Debtor as their joint obligation.

There is no dispute but what the Debtor employed the full $400,000 for his own undisclosed purposes that had nothing to do with Northfield Plaza. According to the Debtor this was his right and prerogative; in his 2004 exam he testified that the full $400,000 was a personal loan to him and he treated it accordingly. This version is, however, at odds not only with the plaintiff's testimony but with the Debtor's documentation of the transaction.

According to the plaintiff, the Debtor told him after their June visit to the shopping center that the parties would need to raise $500,000 to do the deal: $200,000 from each of the Debtor and the plaintiff and $100,000 from the other participant. The plaintiff paid over his own $200,000 to 8916 Perkins Corp.; he testified that the Debtor told him the payment would be held in escrow for acquisition of the shopping center. The Debtor himself described this $200,000 payment as a partnership contribution in the 1985 letter to his lawyer. Soon thereafter the Debtor told plaintiff that the Debtor needed to borrow $200,000 from the plaintiff to fund Debtor's $200,000 commitment to the enterprise.

The Court finds the plaintiff's version of the facts credible and persuasive and borne out by the documentary evidence prepared by the Debtor. The Court finds further that the Debtor induced plaintiff's payment of the initial $200,000 by falsely representing that this payment would be devoted to acquisition of Northfield Plaza and escrowed for that purpose, that this representation was material, known by the Debtor to be false and that it was relied upon by the plaintiff. Therefore the Debtor is liable to the plaintiff in the full amount of $200,000 for fraudulently inducing this $200,000 payment. For this reason this $200,000 liability is nondischargeable under subsection 523(a)(2)(A) of the Bankruptcy Code.

In addition, this liability also appears to be nondischargeable under section 523(a)(4) and (6) of the Code. Under section 523(a)(4) any debt "for fraud or defalcation while acting in a fiduciary capacity" is nondischargeable. Debtor admittedly used the Debtor's $200,000 payment for his own purposes. This was a defalcation. *In re Johnson*, 691 F.2d 249, 254 (6th Cir. 1982). The only question is whether the Debtor was acting in a fiduciary capacity for purposes of section 523(a)(4).

Although the Northfield Plaza syndication did not go forward and no partner-

ship papers were signed, the Debtor solicited and received the plaintiff's $200,000 in contemplation of their acquiring, managing and syndicating Northfield Plaza. As previously noted, the Debtor himself characterized this $200,000 payment as a partnership contribution in a letter to his lawyer. This was enough to constitute the parties' partners, *see Bouslough v. Shingledecker*, 97 Ohio App. 329, 125 N.E.2d 885 (1953), and to impose on the Debtor the obligations of a fiduciary in respect of these moneys. 13 O.Jur.3d, *Business Relationships* § 959 (1979); *Lorain Nat'l Bank v. Saratoga Apartments*, 61 Ohio App.3d 127, 572 N.E.2d 198 (1989); *Hanes v. Giambrone*, 14 Ohio App.3d 400, 471 N.E.2d 801 (1984); *Reed v. Robilio*, 400 F.2d 730 (6th Cir. 1968).

Nevertheless, there is a question as to whether the Debtor acted in a "fiduciary capacity" under section 523(a)(4) when he converted the $200,000 to his own use. Most courts, including the Sixth Circuit Court of Appeals, have stated that "fiduciary capacity" in section 523(a)(4) is to be limited to the trustees of express trusts, *see In re Johnson, supra* at 251, and some courts have held that the Uniform Partnership Act in force in most states (including Ohio) does not constitute a partner a trustee of partnership property for purposes of section 523(a)(4). *See, e.g., Rolley v. Spector (In re Spector)*, 133 B.R. 733 (Bkrtcy. E.D.Pa.1991); *contra Getaz v. Stewart (In re Stewart)*, 123 B.R. 817 (Bankr. W.D.Tenn.1991); *see also Lewis v. Short (In re Short)*, 818 F.2d 693 (9th Cir.1987) (holding that Washington law makes a partner a fiduciary within the meaning of section 523(a)(4)); *Ragsdale v. Haller (In re Haller)*, 780 F.2d 794 (9th Cir.1986) (holding that California case law makes a partner a fiduciary within the meaning of section 523(a)(4)); *Beebe v. Schwenn (In re Schwenn)*, 126 B.R. 351 (D.Colo.1991) (holding that Colorado case law makes a partner a fiduciary within the meaning of section 523(a)(4)). However, the Sixth Circuit has not ruled on the application of section 523(a)(4) in the partnership context.

In view of the Supreme Court's recent mandate to give effect to the "plain meaning" of statutory language, (*see United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Union Bank v. Wolas (In re ZZZZ Best Co., Inc.)*, —— U.S. ——, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)), it appears likely that the Sixth Circuit would hold section 523(a)(4) applicable under the facts of this case. Section 523(a)(4) applies to defalcations "while acting in a fiduciary capacity." In its plain and ordinary meaning the term "fiduciary capacity" extends to the relationship between partners. Moreover, such a holding would be consistent with *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the case which first distinguished real trusts involving fiduciary relationship from implied trusts.

*Davis* held that a trust receipts financing was not a true trust, despite its use of the language of trusts, but merely a commercial lending device without real elements of trust or confidence. But a partnership relationship, like that which existed here, imposes real elements of trust and confidence which imposed fiduciary obligations on the Debtor in respect of the plaintiff's $200,000. Therefore, the obligation is nondischargeable under section 523(a)(4) of the Bankruptcy Code.

Finally, the Court finds that this obligation is also nondischargeable under section 523(a)(6) of the Code. That section is applicable to tortious conversion of another's property, at least where coupled, as here, with intentional wrongdoing. *Vulcan Coals, Inc. v. Howard (In re Howard)*, 946 F.2d 1226 (6th Cir.1991); 3 *Collier on Bankruptcy* ¶ 523.16 (15th ed. 1991). The Debtor knowingly and willfully converted to his own use property of his partnership with the plaintiff, property to which the plaintiff was entitled were it not used to acquire the shopping center.

Here again, however, the Court finds that the plaintiff has failed to show that he is entitled to interest on his $200,000. As in the case of Peroil 1985, plaintiff's request for punitive damages is discussed subsequently.

## WESTLAND PLAZA

Plaintiff made the last payment in question, $350,000, in November 1985. This time the Debtor told him that the money was needed only briefly to facilitate a mortgage refinancing of Westland Plaza Limited, another limited partnership in which Debtor was the general partner. The inducement was a $46,000 payment which would have provided the plaintiff a 79 percent annualized return on his loan had it been repaid in 60 days, which Debtor said was the outer limit it would be outstanding.

Westland Plaza Limited owned and managed a strip shopping center near Columbus, Ohio. The Debtor told plaintiff that he was in the process of refinancing its mortgage debt but wanted to pay off the existing mortgage prior to taking down the new financing. He assured plaintiff that his money would be safe since his loan would be a first claim on Westland Plaza's assets which would be unencumbered after its mortgage was paid off. Therefore it appeared to plaintiff that he would make over $46,000 on a risk-free loan to be outstanding for less than two months. Debtor's assurance that such was the case was reinforced in the agreement Debtor prepared to document the loan. Paragraph (11) of that agreement provided that:

> The parties expressly acknowledge that the advancement made by **Lender** [plaintiff] to **Partnership** is for the purpose of enabling **Partnership** to fully discharge all of its indebtedness, which mortgage note is secured by a first mortgage lien on that certain parcel of real property known as "Westland Plaza" located 4160 West Broad Street, Columbus, Ohio.

This agreement was signed by the plaintiff and by Westland Plaza Limited by the Debtor as general partner. The $350,000 loan was evidenced by Westland Plaza's promissory note, which was also executed by the Debtor as general partner.

Debtor did not personally guarantee the loan but in his 2004 examination appeared to assume personal responsibility. In his testimony he acknowledged that the loan proceeds had not been used to pay off Westland Plaza's mortgage, that, in fact, he had used the loan proceeds for his own purposes. The Debtor explained that Westland Plaza was indebted to him personally and that the plaintiff's $350,000 loan was to be repaid after Westland Plaza had refinanced its debt and repaid its obligation to the Debtor.

To the extent that this explanation was intended as an alternative to plaintiff's version of the loan, it is patently inconsistent with the agreement Debtor drafted and presented to the plaintiff. It is consistent, however, with the fact that the Debtor never intended to, or did, use the loan in connection with Westland Plaza Limited despite his representations to the plaintiff. This divergence between representation, intent and reality is highlighted by the fact that the Debtor never caused this $350,000 loan to be shown as an obligation of Westland Plaza on its financial records. Debtor used Westland Plaza as a plausible pretext for disguising his personal need for money. In the process he materially misrepresented the circumstances of the loan.

The Debtor questions, however, the plaintiff's reliance on these representations. He argues that a return of 79 percent is excessive for a secure short-term loan. Debtor seeks to avoid responsibility for his fraud by portraying the plaintiff as a greedy speculator who deserves to be stuck with his own loss.

But the issue is reliance, not greed. Plaintiff's representations were plausible. Although a wiser man than plaintiff might have questioned the 79 percent return or sought additional protections, the plaintiff may not be penalized for acting unwisely. Moreover, the charge of greed is unfair. Debtor presented himself to plaintiff as a reputable, sophisticated investment expert. There was no reason for plaintiff to question the propriety or appropriateness of the return the Debtor offered. Therefore the plaintiff has met the criteria to establish liability for fraud under Ohio law and the nondischargeability of that liability under section 523(a)(2)(A) of the Bankruptcy Code.

There is no merit to Debtor's argument that plaintiff must first have exhausted his remedies against Westland Plaza. The Debtor is directly and primarily responsible for loss arising out of his own fraud, whether or not the partnership is liable under its note to plaintiff. Ohio Rev.Code § 1777.01. Even if Westland Plaza is liable despite the fact that it received no benefit from the plaintiff's loan and the Debtor apparently breached his duty to Westland Plaza in committing this loan on its behalf, it appears that Westland Plaza had gone under by the time of trial. At his 2004 examination the Debtor acknowledged that his interest in Westland Plaza was worthless since the mortgagee had foreclosed on the shopping center.

It does not appear, however, that this obligation is nondischargeable under either section 523(a)(4) or (6). The evidence does not show that Debtor was acting in a fiduciary capacity to the plaintiff in this transaction. Similarly, apart from Debtor's fraud in obtaining the $350,000, there is no evidence of conversion or other injury to the plaintiff's property for purposes of section 523(a)(6).

It is a closer question as to whether plaintiff is entitled to interest on this claim in view of Debtor's admission at his 2004 exam that he was responsible for the loan and that it was intended for his benefit. But the Debtor did not sign the loan documents personally; the basis of Debtor's liability is fraud. Plaintiff has presented no authority justifying an award of interest.

## PUNITIVE DAMAGES

Plaintiff has requested punitive damages in connection with each of the payments discussed above. The Court's finding of fraud as to each payment could under appropriate circumstances justify such an award. *Semann v. Allied Supermarkets (In re Allied Supermarkets)*, 951 F.2d 718 (6th Cir.1991). But the circumstances here are not appropriate.

The purpose of punitive damages is to punish and deter a repetition of wrongful action, "and they are never awarded as a right, no matter how egregious the defendant's conduct." *Smith v. Wade*, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983). Conceding the seriousness of Debtor's improper behavior, the Court would view the imposition of a further nondischargeable debt load on the Debtor as punitive overkill. It is by no means clear when, or even whether, the Debtor will be able to pay the debts this Court has ruled nondischargeable. Therefore, the Court views its determination that plaintiff's claims are nondischargeable as sufficient deterrence. Apparently plaintiff agreed since he did not press his claim for punitive damages at trial.

## REVOCATION OF DISCHARGE UNDER SECTION 727(d)(3)

In his sixth cause of action plaintiff requests the Court to revoke the discharge granted the Debtor in this case on August 27, 1990. The ground for the request is the Debtor's alleged violation of an order of this Court entered April 10, 1990 requiring him to turn over check registers to the plaintiff. Plaintiff's request is made pursuant to section 727(d)(3) of the Bankruptcy Code which provides in relevant part: "[T]he court shall revoke a discharge granted under subsection (a) of this section if ... (3) the debtor committed an act specified in subsection (a)(6) of this section." Section 727(a) provides in turn that: "The court shall grant the debtor a discharge, unless ... (6) the debtor has refused, in the case (A) to obey any lawful order of the court, other than an order to respond to a material question or to testify."

It appears that some check registers relating to the Debtor, 8916 Perkins Corp. and his oil and gas partnerships are unaccounted for, but the evidence presented by plaintiff is too hazy to justify a finding that the Debtor refused to obey the Court's order to turn them over to plaintiff. It appears that no one inventoried the documents and records produced by the Debtor in 1989 in connection with his 2004 examination. Apparently some of these materials were in the possession of his accountants, some were turned over directly

to his attorneys and others were turned over to his creditors' lawyers.

It appears that questions regarding the check registers arose first at the Debtor's July 18, 1989, 2004 examination. The plaintiff filed a motion to compel production of check registers on February 12, 1990, about ten weeks prior to the deadline for filing complaints to object to the Debtor's discharge. That motion was heard on the Court's March 29, 1990 motion docket. No evidence was presented at that hearing. Based upon the statements of counsel, the Court ruled from the bench that the check registers were to be produced in two weeks or an explanation of the Debtor's failure to do so was to be provided. Thereafter plaintiff submitted the April 10, 1990 order to memorialize the Court's March 29, 1990 bench ruling. That order included the following language:

> [U]pon due consideration the Court finds that the movant has heretofore requested production of these check registers in accordance with B.R. 2004(a), that the debtor has acknowledged the existence of these check registers but has willfully and intentionally refused to produce same.

At that point, however, the problem had been presented to the Court as a discovery problem, not as an order which could result in denial to the Debtor of his discharge. The journal entry was drafted by counsel for plaintiff and set May 10, 1990 as a further hearing date in the event the check registers were not produced.

On April 17, plaintiff filed a notice of default indicating that no check registers had been turned over and noticed a hearing for May 10 at which the Debtor would be required to show cause why he should not be held in contempt. Obviously, plaintiff knew at that time that grounds for objecting to the Debtor's discharge might exist. In fact, at the May 10, 1990 hearing the plaintiff asked the Court to find that either the check registers had been destroyed or that the Debtor was willfully disobeying a court order—both of which were grounds for objecting to discharge under section 727 of the Code. The Debtor testified at that hearing that the check registers existed and had been turned over to the attorneys. The hearing was adjourned to May 31, 1991 to enable plaintiff to prepare a motion requesting an appropriate sanction.

On May 24, 1990, plaintiff filed a supplemental motion requesting that Debtor's discharge be denied because of his failure to turn over the check registers. The Court denied that request at the May 31, 1991 hearing for the reason, among others, that under Bankruptcy Rule 7001(4) the plaintiff was required to file an adversary proceeding to object to discharge. At the May 31 hearing the Court ordered Debtor's attorneys to review the materials turned over to them by the Debtor to determine whether they included the check registers. On June 8, 1990, Debtor's counsel advised the Court that they did not.

The upshot of the May 10 and May 31 hearings was that the existence and locus of the check registers remained in doubt. In view of this the "finding" in the April 10 order was implicitly subject to modification at the subsequent contempt hearing; it is not binding on the Court or the Debtor for purposes of this adversary proceeding. To the extent that the quoted finding from the April 10 order was intended by plaintiff to short-circuit the required adversary proceeding or to substitute for proof in that proceeding, it will be deemed deleted.

In its memorandum of opinion in this proceeding entered May 2, 1991, 129 B.R. 480, the Court made clear that the plaintiff must produce evidence in addition to that finding to justify revocation of the plaintiff's discharge. No such evidence has been produced. But even if it had, this proceeding was filed too late to deny the Debtor his discharge.

In its May 2, 1991 opinion the Court indicated that the Debtor's discharge could not be revoked on grounds known to the plaintiff in time to have permitted him to file an adversary proceeding objecting to discharge prior to expiration of the bar date. Plaintiff has cited no authority suggesting that the Court reconsider this conclusion and the Court is aware of none.

In his brief, plaintiff justifies his delay on the ground that he thought the check registers were contained in materials which had been sealed by the District Court in connection with other litigation. However, the history of this case and, in particular, the plaintiff's February 12, 1990 motion and his April 17, 1990 notice of default indicate that plaintiff suspected that the Debtor either had concealed or destroyed the check registers or had failed to obey an order of the Court—both of which are, as noted, grounds for denial of a discharge. The April 10, 1990 order on which the plaintiff relies for the finding that the Debtor willfully violated a court order was itself signed three weeks prior to the expiration of the bar date.

During this period, on March 27, 1990, plaintiff obtained one of several extensions of time to file a complaint under section 523 of the Bankruptcy Code; he was clearly aware of the problem with the check registers at that time; he could and should have obtained an extension of time to object to Debtor's discharge if he was not at that time prepared to file an objection to discharge. Under all the circumstances, the Court holds that plaintiff has failed to establish grounds to revoke Debtor's discharge.

## ADMISSION OF PLAINTIFF'S 2004 EXAMINATION

■ Both at trial and in a post trial brief Debtor objected to admission into evidence of portions of his 2004 examination in 1989. At trial Debtor's objection was based on surprise, on hearsay and on his argument that admission of his prior testimony was inconsistent with, and somehow derogated from, his Fifth Amendment privilege against self-incrimination. After the Court overruled this objection, the Debtor moved the admission of the transcript of the entire 2004 examination. In his post trial brief he also argues that the transcript was inadmissible because the Debtor had not signed the transcript. None of his arguments has merit.

Admission of all or any part of the 1989 transcript has nothing to do with Debtor's invocation of his Fifth Amendment privilege at trial. Debtor's testimony at the 2004 examination was elicited in the presence of counsel for several creditors; Debtor's counsel participated actively. Debtor's testimony was taken down and transcribed by a court reporter; the proceeding was not confidential and the Debtor made no effort to have either the examination or the transcript treated confidentially. In fact, the Debtor himself made the transcript a matter of public record by attaching it to a pleading he filed on June 4, 1990 in this case.

Whatever potential for incrimination exists in the transcript is not enhanced or otherwise affected by use of the transcript at this trial. The time to have invoked the Fifth Amendment privilege was at the 2004 examination. If that examination let the cat out of the bag, the Court's refusal to admit his prior testimony in evidence will not put it back.

■ Debtor's claim of surprise is equally without merit. Plaintiff designated as witnesses only the plaintiff, the defendant, the Debtor's accountant and two of Debtor's attorneys. It was obvious that the Debtor's testimony was important to plaintiff's case. Moreover, plaintiff's reading of portions of Debtor's deposition at the trial does not violate the Court's pretrial order requiring the parties to designate documents they intend to introduce into evidence. Had Debtor testified at trial, the Court's pretrial order would not have precluded its use. Rule 32(a)(2) of the Federal Rules of Civil Procedure provides that a deposition of a party may be used by an adverse party at trial for any purpose:

> It has been consistently held that the Rule permits a party to introduce as part of his substantive proof, the deposition of his adversary, and it is quite immaterial that the adversary is available to testify or has testified there. Thus applied, the Rule is a restatement of the long recognized rule of evidence that statements of a party which are inconsistent with his claim in litigation are substantively admissible against him.

8 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2145 (1991) quoting *Community Counselling Serv., Inc. v. Reilly*, 317 F.2d 239, 243 (4th Cir.1963). *See also* Fed.R.Evid. 801(d)(2). The Debtor should have expected that the transcript of the Debtor's 2004 examination would be used appropriately under applicable rules of evidence and procedure whether or not listed by the plaintiff as a document he intended to introduce as evidence.

 Finally, the Debtor's argument that the transcript is inadmissible because the Debtor failed to sign it is equally unavailing. The Debtor submitted this transcript to the Court on his own motion without any suggestion that it inaccurately stated the Debtor's testimony. At trial the Debtor in lengthy argument made no suggestion that the transcript did not accurately state his testimony. Moreover, he moved the admission of the transcript of the entire 2004 examination. These actions by Debtor clearly validate the transcript as his testimony as fully as if he had signed the transcript. By his actions the Debtor waived his right to sign the transcript under Rule 30(e). *See cf. Van Pragg v. Columbia Classics Corp.*, 849 F.2d 1106 (8th Cir.1988) (no error in admitting an unsigned deposition transcript when counsel had seen transcript in advance and had not questioned its authenticity).

The Court's order in accordance with this opinion has been entered on the date hereof.

### JUDGMENT

A Memorandum of Opinion having been rendered this date in this adversary proceeding,

IT IS ORDERED, ADJUDGED AND DECREED that:

The Debtor is liable to the plaintiff in the amount of $812,644.90. This indebtedness is nondischargeable under section 523 of the Bankruptcy Code.